Filed 11/7/14  P. v. Amezcua CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JUAN CARLOS AMEZCUA,<br><br>    Defendant and Appellant. | F064904<br><br>(Super. Ct. No. MCR032571A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Madera County.  James E. Oakley, Judge.

Kyle Gee, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Carlos A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Juan Carlos Amezcua and codefendant Eucario Avalos Ruiz[1] were charged with murder (Pen. Code,[2] § 187, subd. (a); count 1) and active participation in a criminal street gang (§ 186.22, subd. (a); count 2). As to count 1, the information alleged that Amezcua committed the offense for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)) and personally and intentionally discharged a firearm, which proximately caused the victim's death (§ 12022.53, subd. (d)). As to count 2, the information alleged that Amezcua personally used a firearm (§ 12022.5, subd. (a)). The trial court impaneled dual juries. Amezcua's jury acquitted him of first degree murder, convicted him of second degree murder and gang participation, and found true each of the above mentioned special allegations.

Amezcua makes several contentions on appeal. First, the trial court failed to instruct the jury on involuntary manslaughter as a lesser included offense of murder. Next, the court improperly gave CALCRIM No. 250 on the union of act and general intent for counts 1 and 2 and CALCRIM No. 251 on the union of act and specific intent and/or mental state for count 2. Finally, the court improperly allowed the prosecutor to tell jurors in summation that they may draw a negative inference from an immunized witness's refusal to answer her questions.[3]

---

[1]    To avoid confusion, we identify individuals who share the same surname by their first names.

[2]    Unless otherwise indicated, subsequent statutory citations refer to the Penal Code.

[3]    Amezcua offers two other contentions. First, he asserts that "should [the Supreme Court] determine[] that [*People v. Garcia* (2008) 162 Cal.App.4th 18 (*Garcia*)] was correctly decided, the trial court erred in failing to instruct sua sponte that an unintentional killing committed without malice during an assaultive felony constitutes *voluntary* manslaughter." (Capitalization omitted, italics added.) In *Garcia*, Division Seven of the Second Appellate District ruled that "an unlawful killing during the commission of an inherently dangerous felony, even if unintentional, is at least voluntary manslaughter." (*Garcia, supra*, at p. 31.) In *People v. Bryant* (2013) 56 Cal.4th 959, 970 (*Bryant*), which was decided shortly after Amezcua filed his opening brief, the Supreme Court held:

We conclude:  (1) the trial court was not obliged to instruct the jury on involuntary manslaughter because there was no substantial evidence that the killing was committed without malice aforethought; (2) the court's issuance of CALCRIM No. 250 for counts 1 and 2 and CALCRIM No. 251 for count 2 did not prejudice Amezcua since the evidence showed beyond a reasonable doubt that the erroneous instructions made no difference in reaching the verdict obtained; and (3) the court did not abuse its discretion when it allowed the prosecutor to argue that jurors may draw a negative inference from an immunized witness's refusal to provide relevant testimony.  Therefore, we affirm the judgment.

## STATEMENT OF FACTS

### I.      The night of the shooting

The victim, Victor Raqueno, died of a massive hemorrhage of the left common carotid artery inflicted by a .22- to .40-caliber bullet.  Numerous witnesses offered accounts of the events leading to his death.

---

"A defendant who has killed without malice in the commission of an inherently dangerous assaultive felony must have killed without either an intent to kill or a conscious disregard for life.  Such a killing cannot be voluntary manslaughter because voluntary manslaughter requires either an intent to kill or a conscious disregard for life.  To the extent that [*Garcia*] suggested otherwise, it is now disapproved."

In view of *Bryant*, Amezcua's alternative argument that the court was obliged under *Garcia* to instruct the jury on voluntary manslaughter as a lesser included offense of murder has been rendered moot.

Second, if our court concludes that the claimed instructional errors—i.e., the trial court's failure to instruct on involuntary manslaughter and failure to properly instruct on specific intent and/or mental state—were either "invited, waived, or forfeited," Amezcua asserts that "he received ineffective assistance when counsel failed to ensure proper instructions." (Capitalization omitted.)  Since we do not reach such a conclusion, we need not address this argument.

3.

a.     *Odelia Garcia*

On July 18, 2008, at or around 8:30 p.m., Garcia arrived at the home of Isaac and Roger Marz, located at 1224 Davis Street on the southwest corner of Davis Street and Sherwood Way in Madera, California. Garcia was celebrating her birthday with approximately 45 of her relatives and friends, including Raqueno. Guests were asked to wear red and black, Garcia's favorite colors, and prohibited from lingering in the front yard. Individuals who "didn't know the name 'Odelia'" were turned away at the door. At some point, Garcia learned that a male party guest was talking on a cell phone in the front yard. She went outside and asked the guest to come inside. At that moment, a five-foot-four-inch "baby-faced" "Mexican" man sporting a white T-shirt and a fade haircut[4] approached them and "started saying stuff" to the guest.[5] Garcia noticed that the man was holding a gun and wearing a black glove.[6] As she nudged the guest toward the house, she told the armed man that she "didn't want any problems" and asked him to "just please leave" and "not to start anything." The armed man, who had been standing on Davis Street, walked around the house and onto Sherwood Way. Meanwhile, "a large amount of people rushed outside of the house." Isaac, Roger, and two other male guests jumped over the fence parallel to Sherwood Way while Raqueno "came running from Sherwood [Way] up towards where everything was happening."

---

[4]     Garcia described a fade haircut as "where the males … take their hair really short on the side next to their ears" and "have a little bit more hair on the top of their head than with the rest of it."

[5]     In an interview conducted on the night of the shooting, Garcia told Detective Sean Bushey that she saw two unknown men arguing with two party guests and informed the men that "it wasn't a gang party."

[6]     At trial, Garcia acknowledged that she originally reported to police that the armed man wore white latex gloves.

Soon after, a car appeared on Sherwood Way. About five men exited the vehicle and fought unarmed party guests.[7] Two of the men attacked Raqueno. At one point, Garcia saw the armed man point and wave his gun at Isaac and Roger. When Raqueno's assailants returned to the car, Raqueno shoved one of them into the vehicle, "slammed the door," and "sw[u]ng[] at the people who were inside" through an open window.[8] As the car was leaving, Garcia heard two gunshots.[9]

Garcia was shown a six-pack photo lineup that did not include a picture of Amezcua. She wrote an "X" and her initials next to the picture of Adam Diaz and remarked that Adam's face "'looked like [the armed man's] when he saw that I saw the gun, the same dumbfounded look.'" Garcia did not identify Adam as the shooter. When she was later shown a second photo lineup that included a picture of Amezcua, Garcia was unable to identify him.

b.     *Samuel Sheridan*

Sheridan attended Garcia's birthday party with two friends, but did not personally know Garcia. At some point, he went to the front yard to make a phone call. A few minutes later, two Hispanic men wearing white T-shirts approached Sheridan and shouted gang slurs, including "puro sur." The first man had a shaved head and stood between five feet and five feet six inches tall. The second man was taller than the first man by at least three inches. The two asked Sheridan, "[W]hat do you claim?" Sheridan responded, "I claim myself."

---

**7**     Garcia testified, "It wasn't all 45 people fighting on top of five guys, it wasn't like that. It was a few of the guys from our party were trying to defend us. And, of course, they were fighting with the guys who were there."

**8**     Garcia told Bushey that the armed man was one of Raqueno's assailants and the person that Raqueno shoved into the car.

**9**     At trial, Garcia acknowledged that she originally reported to police that she "saw the armed man in the front passenger seat lean back in his seat, aim the gun at [Raqueno,] and fire a round at him as the vehicle rolled away."

5.

As Sheridan headed into the house, the two men walked onto Sherwood Way. Once inside, he observed at least five guests go outside. Approximately 10 to 15 minutes later, Sheridan heard gunfire. He went to the front yard, where "[a] bunch of people [were] yelling that [Raqueno] got shot."

c.      *Isaac Marz*

Isaac and his brother Roger hosted Garcia's birthday party at their home on the night of July 18, 2008, and the early morning of July 19, 2008. Isaac was in the back yard at or around 12:30 a.m. when Garcia informed him that "there w[ere] people starting stuff out in the front." He went to the front yard, where four Hispanic males were standing beyond the fence. At least one of the men asked, "'Where are you from?'" When Isaac and Roger jumped over the fence, one of the strangers drew and waved a black gun. Isaac and Roger backed away and stated, "[W]e don't want no problems." Isaac noticed that the armed man was wearing a black glove.

Meanwhile, Raqueno "[came] around the other side of the fence" and fought one of the strangers. During the commotion, Isaac heard someone yell, "[S]outh side VCG." At some point, Raqueno pushed one of the strangers into the passenger seat of a white car. As the car was leaving, Isaac heard a gunshot. Afterward, Raqueno walked toward Isaac, indicated that he had been shot, and collapsed.

Isaac was shown a photo lineup that included a picture of Amezcua. He identified Amezcua as the armed man, but "wasn't 100 percent sure."

d.      *Roger Marz*

At or around midnight, Roger went to the front yard because "there w[ere] some people trying to get in." He noticed a Hispanic man wearing black gloves, told the man to leave, and returned to the house. When 15 to 20 guests subsequently rushed outside, Roger followed. He jumped over the fence parallel to Sherwood Way when he saw his brother Isaac on the other side "look[ing] like he was about to square up with another guy." Raqueno, meanwhile, was fighting someone else. Roger heard cries of "VCG"

6.

and "Sur." When the fighting subsided, four Hispanic men, including Raqueno's opponent, went to a white car parked on Sherwood Way with its doors ajar. One of the men pulled out a gun and "point[ed] it at everybody, waving it back and forth." At some point, Raqueno shoved his opponent into the car and kicked the door. As the car was leaving, Roger heard a gunshot.[10] He watched Raqueno stumble onto the sidewalk and collapse. Roger spotted a wound on Raqueno's neck.

e.    *Amanda Moralez*

At or around midnight, Moralez and about six to seven other party guests went to the front yard after her cousin told her that "there [were] guys yelling '[S]outh side.'"[11] Outside, she saw four Hispanic men. One of the men, who was five feet nine inches in height, pulled out a revolver and pointed it at Isaac and Roger, who had jumped over the fence. As Isaac and Roger backed away, the armed man entered the back seat of a white or gray car parked in the middle of Sherwood Way. Moralez observed two other men standing next to the car. At some point, Raqueno, who was unarmed, "r[a]n outside from the side of the house" and "started fighting" a taller, five-foot-nine-inch to five-foot-ten-inch man with a fade haircut.[12] When Raqueno's opponent headed toward the car, Raqueno followed him, continued to fight, and slammed and kicked the car door. Soon after, Moralez heard a gunshot. She saw Raqueno stagger toward the house, grab his throat, and acknowledge that he had been shot.

---

**10**    In an interview conducted on the night of the shooting, Roger told Officer Mark Trukki that Raqueno pushed his opponent during their fight and the opponent "pulled out a gun and shot once in [Raqueno's] direction."

**11**    Moralez testified that she herself heard cries of "[S]outh side" and "VCG."

**12**    In an interview conducted on the night of the shooting, Moralez told Detective Robert Hill that Raqueno fought a bald, five-foot-two-inch Hispanic male. She also mentioned, however, that the man who brandished the gun was the same person who fought and shot Raqueno. Moralez described the shooter as a five-foot-seven-inch male with a mustache, goatee, and light complexion.

Moralez was shown a six-pack photo lineup that did not include a picture of Amezcua, but included pictures of Adam and Andrew Diaz. She wrote that Adam "looks like the driver" and Andrew "looks like the shooter."

f.    *Lisa Lopez*

Lopez, a party guest, went to the front yard and saw Raqueno fighting a Hispanic male who was "not too tall," of "medium build," and wearing a white T-shirt. Raqueno and the stranger were near the passenger side of a white car idling on the street.[13] At some point, Lopez screamed, "'Stop, [s]top. I'm gonna call the cops.'" After Isaac and Roger pulled Raqueno and the stranger apart, the stranger went to the car, reemerged with a silver semiautomatic handgun, and shot Raqueno from a distance of six to eight feet. Lopez did not hear gunfire, but saw Raqueno "holding his neck and struggling to get around."

Lopez was shown a photo lineup that included a picture of Amezcua. She circled Amezcua's picture and wrote, "[S]omething about his face."

g.    *Carissa Upshaw*

At or around midnight, Upshaw, a party guest, went to her truck, which was parked on Davis Street, to change shoes. When she returned to the house, she noticed that "everybody was … standing outside." At that moment, a five-foot-four-inch to five-foot-six-inch Hispanic man sporting a white T-shirt and "very short hair" approached the front of the house and yelled "Sur 13" at least five times. Upshaw informed the man, "[T]here's nobody here that is gang-related. I think you have the wrong party." At least four male guests, including Raqueno, came to the front yard and told the stranger to "take that somewhere else." When the stranger walked around the house and onto Sherwood

---

**13**    In an interview conducted on the night of the shooting, Lopez told Officer Juan Gaona that she heard Raqueno shout, "This is not that kind of a party." She also heard someone yell, "[S]outh side."

Way, Raqueno and another guest jumped over the fence and told the stranger to leave. After either Raqueno or the other guest pushed the stranger, Upshaw heard two gunshots. She recalled that the stranger raised his arm "about shoulder height" and made a gesture with his hand "as if [he] w[as] holding something," but she did not see a gun. A white four-door car appeared and the stranger entered the back seat through the passenger side. After the car left, guests attended to Raqueno, who was injured.[14]

h. *Joshua Lucero*

Lucero and two friends were in a convertible on Davis Street en route to Garcia's party. While they were looking for parking around midnight, Lucero saw Eucario and Amezcua walking in the middle of Davis Street. He recognized Eucario as a neighbor of his grandmother and a gang member by the moniker "Shy Boy" and Amezcua, who he met a few times beforehand through Eucario, as a gang member by the moniker "Menace." Lucero exited the convertible, walked toward Eucario and Amezcua, and said, "'What's up?'" Eucario and Amezcua, who were initially startled, recognized him, told him to "kick back," and stated, "'We're going to go down and handle some business.'" Amezcua carried a small silver revolver. Both wore rubber gloves.

Lucero returned to the convertible and advised his friends to leave the area. Because one of his friends knew someone who was already at the party, the three drove back toward the corner of Davis Street and Sherwood Way and warned that person via

---

**14** In one interview conducted on the night of the shooting, Upshaw told Officer Dan Foss that two Hispanic men approached the house, one of whom confronted Sheridan. One of the strangers, who she identified as "Stutters," wore latex gloves and fought Raqueno. During the altercation, Stutters drew a small handgun and fired one round. Upshaw indicated that Stutters "knew where she lived [and] where she worked."

In another interview, Upshaw told Bushey that the two men who approached the house were between five feet three inches and five feet five inches in height, were "clean shaven," had "thin black hair," and wore white T-shirts and blue jeans. One of the men fought Raqueno and was pushed into a white four-door sedan. At that point, the man pulled out a gun and shot Raqueno.

phone call "to get out of there." When they arrived, Lucero saw "a bunch of people outside" fighting. At some point, another car pulled up. As Lucero and his friends were leaving the scene, he saw Amezcua standing on the sidewalk and firing the gun.

i. *Joseph Suarez*

At or around midnight, Suarez was walking westbound on Sherwood Way en route to the home of a friend who lived on Davis Street about "five houses down" from the Marz residence. When Suarez made a left turn onto Davis Street, he saw two "Mexican" men walking in the street. One of the men was "taller," "skinny," and "bald" while the other was "shorter," "more stocky," and had "kind of long" hair. At least one of them wore white gloves. Suarez initially passed the two men, but turned around when he heard them yell, "[S]outh side," "[F]uck you," "[P]ussy," and other gang slurs and taunts toward the Marz residence. After the provocateurs turned left onto Sherwood Way, "a few guys came out of the house wanting to fight" them and a "[c]ouple of guys jumped the fence." The taller provocateur fought a "tall" houseguest while the shorter provocateur pointed a small silver gun at other houseguests who jumped over the fence.

During the fight, a medium "tan brown" car appeared on the corner of Davis Street and Sherwood Way. The taller provocateur entered the back seat while the armed provocateur entered the passenger seat. Afterward, the tall houseguest kicked the front passenger door. Suarez then heard a gunshot and saw a "big flash" from the inside of the vehicle. When the car drove off, the tall houseguest walked back to the house and collapsed next to the front gate.[15]

Suarez was shown a six-pack photo lineup that included a picture of Amezcua. He identified Amezcua as the shooter.

---

[15]     The record indicates that Raqueno stood five feet four and one-half inches tall.

j. *Peter Major*

At trial, Major identified Eucario as "Shy Boy" and Amezcua as "Menace." He testified that he was Eucario's "[g]ood friend" and met Amezcua for the first time in July 2008. On July 19, 2008, at or around 1:00 a.m., Major, then 12 years old, was in his apartment, located at 120 West Cleveland Avenue, when he heard gunfire. Through his sister's bedroom window, he observed people running down Davis Street and yelling, "[S]omebody got shot." Major could not recall what he initially reported to police and denied seeing Amezcua with a gun and hearing Amezcua comment on the shooting. He acknowledged that "Southerners" loitered near a wall on Cleveland Avenue.

In previous interviews dated July 28, 2008,[16] Major told Detectives Robert Hill and Hector Garibay that he was riding his bicycle outside sometime between midnight and 1:00 a.m. when he saw a "light medium" grey car drop off Amezcua and Eucario on Cleveland Avenue between Davis Street and Philip Street. The driver handed a silver revolver to Amezcua, who "pushed [it] into his shorts." Major followed Amezcua and Eucario on his bicycle as they walked northbound on Davis Street. He saw them speak to people in a black Mustang convertible. Afterward, Amezcua and Eucario circled the block in the grey car twice and went to a house.[17]

At some point, Major heard Amezcua yell, "[S]outh side." He also saw someone kick Eucario in the head as Eucario was entering the grey car. Before the car left, Amezcua shot the person who kicked Eucario. A day later, Amezcua told Major "not to say anything" and admitted, "I was trying to shoot more people but the gun broke." In addition, Eucario told Major that he originally intended to "hide [the gun] from the

---

**16** The jury watched a video recording of these interviews.

**17** Major also told detectives that Amezcua "got into a white [Ford] F150" at some point before he and Eucario went to the house.

11.

police," but instead discarded the firearm because it was broken. Major noted that Amezcua shaved his head after the shooting.

k. *Susella Jaime*

At trial, Jaime, Major's sister, identified Eucario as "Shy Boy." She testified that Eucario lived with her and her family, including Major, in 2008. Jaime could not recall receiving a phone call from Eucario sometime after the shooting. In a previous interview dated July 28, 2008,[18] she told Hill and Garibay that Eucario called her and asked if he could hide a gun "really good" at the apartment. Jaime refused.

## II. Subsequent searches and Amezcua's arrest

On July 22, 2008, police officers conducted a search at 17105 Avon Way, Amezcua's home address. They found a pair of jeans with a folded blue bandana in the back pocket, a Dallas Cowboys sign, a Los Angeles Dodgers sweatshirt, other blue attire, and a bulletproof vest. On the same day, officers conducted a search at 341 Wilson Avenue, Eucario's home address. They retrieved two photo albums and a T-shirt.

While he was in the process of a serving the search warrant at 341 Wilson Avenue, Officer James Ellenberger spotted Amezcua across the street. Amezcua fled and Ellenberger chased him to a residence south of Cleveland Avenue. When Amezcua "took a fighting stance," Ellenberger forced him to the ground and arrested him.

## III. Gang evidence

a. *Officer Jason Dilbeck*

Dilbeck, a gang expert, testified that 1,700 to 2,000 Sureños reside in Madera. They wear blue clothes, including Dallas Cowboys and Los Angeles Dodgers apparel, and identify with the number 13 because the 13th letter of the alphabet, M, stands for the Mexican Mafia, the prison gang to whom they pledge allegiance. Sureños primarily engage in shootings, stabbings, assaults with a deadly weapon, robberies, burglaries, and

---

[18]    The jury watched a video recording of this interview.

12.

narcotics sales.**19**  Their chief rivals are the Norteños, whose members wear red attire, are loyal to the prison gang Nuestra Familia, and identify with the number 14 because the 14th letter of the alphabet, N, stands for Nuestra Familia.

Dilbeck opined that Amezcua was a Sureño.  Police reports showed that Amezcua actively associated with known Sureños from different subsets, including Vario Central Gangsters (VCG), Vario Knox Street (VKS), Mi Vida Loca (MVL), Vatos Locos Mexicanos (VLM), Pocos Para Locos (PPL), Vatos Locos Sureños (VLS), and the defunct Playboy Sureños (PBS).  He loitered in Sureño territory, uttered gang slogans, wore blue clothing, possessed gang paraphernalia, "mad-dogg[ed]" Norteños, and was involved in altercations with Norteños on a number of occasions.  Amezcua admitted to police that he was a Sureño and was identified by others as a Sureño.  During a recent search of his home, police found a bulletproof vest, blue clothing, a Los Angeles Dodgers sweatshirt, and a Dallas Cowboys sign bearing his moniker "Menace," the numbers one and three, and symbols representing the number 13.  Amezcua had several Sureño-related tattoos, including a Playboy bunny and three dots.

Dilbeck opined that Eucario was a VCG Sureño.  Police reports showed that Eucario actively associated with known members of VCG, MVL, and PBS, engaged in misconduct with such individuals, loitered in Sureño territory, uttered gang slogans, wore blue clothing, possessed gang paraphernalia, and referred to Norteños as his enemies.  He admitted to police that he was a VCG Sureño and was identified by others as a VCG Sureño.  During a recent search of Eucario's home, police officers found a blue shirt displaying the words "South Side 13," "VCG," and "C Life."  They also recovered photo albums containing, inter alia, gang terminology and symbols such as the number 13, three

---

**19**      Dilbeck confirmed that validated Sureños have been convicted of offenses such as first degree murder, voluntary manslaughter, assault with a deadly weapon, and willful discharge of a firearm from a motor vehicle.

dots in a triangle, "VCG," "Central Gangsters," "SUR," "V Central G," "tres," "Sureño por vida," and "VCG 187"; "roll-call" lists "paying respect" to VCG Sureños such as Raul Roja, one of the subset's founders; and photos of Eucario and known VCG Sureños wearing Los Angeles Dodgers and Dallas Cowboys apparel and other blue attire, "throwing up" gang signs, and flaunting their Sureño-related tattoos. Eucario's various tattoos included a bird with the letter "M," the numbers one and three merged with "VCG," a Playboy bunny, three dots, and "XIII."

Dilbeck testified that the area bounded by Sherwood Way and Cleveland Avenue, including 1224 Davis Street, is Norteño territory. VCG Sureños are found south of this territory in the vicinity of Cleveland Avenue and Wilson Street and regularly frequent a nearby wall. In response to the prosecutor's hypothetical questions, Dilbeck opined that two or more Sureños who are armed, enter enemy territory, and shout gang slogans intend to commit a crime. If one of these Sureños shoots and kills a rival, the gang reaps the benefits:

> "We talked about murder being the pinnacle of gang violence, by shooting a perceived rival…. Think about the reputation of the individual, he's somebody in the criminal street gang who killed the enemy. It's going to be that same level of honor, the, ['H]ey, look at what we did.['] That's something you are going to be highly, highly proud of. You know, it would be like having a Super Bowl ring; that's something you could wear for the rest of your life. And this is what they chose to do, this is how they succeed, is to do these types of activities. [¶] … [¶] That gives not only the violent reputation to them, but that's that violent reputation the criminal street gang are going for, because it helps them in felonious conduct."

Dilbeck added that Sureños may target those who merely appear to be Norteños:

> "[P]erception is reality in gang culture. And, you know unfortunately, … that's been a problem in Madera for quite some time. Sometimes people that aren't gang members are the victims of gang crimes because they get it wrong. [¶] … [Y]ou know you could get shot for wearing a Cowboys' jersey and because you're a Cowboys fan, and that's unfortunate. In the same way, you could get shot for wearing a red … jersey in the wrong neighborhood. Like I said, perception is reality to them. It doesn't have to

14.

be true. You don't have to be a gang member to be the victim of a gang member."

b.    *Gerardo Ramirez*

At trial, Ramirez, Eucario's cousin, denied being familiar with VCG and could not recall joining this Sureño subset. In a previous interview dated July 21, 2008, Ramirez informed Garibay that he was a VCG Sureño and was "jumped in" the gang by Eucario, inter alios, in January 2008.

c.    *Veronica Marmolejo*

At trial, Marmolejo, Amezcua's mother, denied that Amezcua was a gang member. She testified that her home was vandalized once. Specifically, the perpetrators wrote the number "14" on the garage door. Marmolejo did not know who was responsible for the damage.

In a previous interview dated July 22, 2008, Marmolejo informed Hill that Amezcua was "a gang member" and was "hanging out with the wrong people." In the past, her home had been vandalized and targeted in a drive-by shooting by "enemies [of] her son."

## DISCUSSION

I.    **The trial court was not obliged to instruct the jury on involuntary manslaughter as a lesser included offense of murder because there was no substantial evidence that the killing was committed without malice aforethought**

a.    *Background*

On March 5, 2012, Amezcua's attorney requested CALCRIM No. 580 for involuntary manslaughter as a lesser included offense of murder. The trial court observed:

> "If we did give [CALCRIM No. 580], the crimes … would be …
> [section 417, subdivision (a)(2)], brandishing a firearm; and [section 245,
> subdivision (a)], assault with a deadly weapon. [¶] … [¶] It would have to
> be that the jury would find that somehow [Amezcua] intended to brandish
> it, but it went off accidentally … [¶] … [¶] [o]r … that he intended to

15.

assault, but not necessarily intended to kill. [¶] … [¶] I think the issue, though, on [CALCRIM No.] 580, and this is something I want all parties to look at, is whether there is any factual basis for it. There's speculation. If [Amezcua] testified there might be some basis for it. But absent [Amezcua] testifying, I think anything else will be speculation at this point. I'm not sure you could articulate a reasonable set of facts."

The prosecutor maintained that CALCRIM No. 580 was unwarranted because the evidence did not sufficiently demonstrate lack of malice. Amezcua's attorney disagreed.

On March 6, 2012, the court decided not to give the instruction:

"[The Court] would cite [*Garcia, supra,*] 162 Cal. App.4th … [at] page 31.… [T]o quote …, 'In light of the Supreme Court's holdings in *People vs. Blakeley* [(2000) 23 Cal.4th 82, and] *People vs. Lasko* [(2000) 23 Cal.4th 101], that a specific intent to kill is not an element of the crime of voluntary manslaughter, and particularly[] [their] express[] disapproval of the statement in [*People v.*] *Burroughs*[ (1984) 35 Cal.3d 824], … that … proof of such an intent is required, … we … conclude an unlawful killing during the commission of an inherently dangerous felony, even if unintentional, is at least voluntary manslaughter.'[20]

"And reading this case and others that it cites, the Court cannot articulate or see how it could be articulated that there is … a complete defense as self-defense, or a complete defense as accident, … or an imperfect [self-]defense, as would reduce … murder to voluntary manslaughter.

"The Court cannot articulate a crime, a misdemeanor, that was being engaged in that really was not, in this case, an inherently dangerous felony. It seems to me that the evidence is that there was a loaded firearm; clearly, that is undisputed.… [A]t some point somebody, at the very minimum, brandished a firearm, a loaded firearm, which under [section] 417[, subdivision (b),] is a felony and certainly inherently dangerous felony.[21] (Underlining omitted.)

---

**20** As noted, the Supreme Court rejected this formulation of voluntary manslaughter in *Bryant*, *supra*, 56 Cal.4th at page 970. (*Ante*, fn. 3.)

**21** The trial court mistakenly applied section 417, subdivision (b), which is limited to cases in which the proscribed conduct is committed on the grounds of a day care center or other youth facility. (See *People v. Rivera* (2003) 114 Cal.App.4th 872, 876-879.)

16.

"So it doesn't seem it to me that involuntary manslaughter would be an appropriate lesser included. [¶] … [¶] [T]he Court is convinced that under the facts of this case, there isn't a basis for involuntary manslaughter; and therefore, the Court would simply have the verdicts be as to murder 1, murder 2, and voluntary manslaughter as to Mr. Amezcua."

b.      *Standard of Review*

We review de novo a trial court's refusal to instruct on a lesser included offense. (*People v. Cook* (2006) 39 Cal.4th 566, 596 (*Cook*); *People v. Cole* (2004) 33 Cal.4th 1158, 1215, 1218; *People v. Waidla* (2000) 22 Cal.4th 690, 733.)

c.      *Analysis*

"A criminal defendant has a constitutional right to have the jury determine every material issue presented by the evidence, and an erroneous failure to instruct on a lesser included offense constitutes a denial of that right. To protect this right and the broader interest of safeguarding the jury's function of ascertaining the truth, a trial court must instruct on an uncharged offense that is less serious than, and included in, a charged greater offense, even in the absence of a request, whenever there is substantial evidence raising a question as to whether all of the elements of the charged greater offense are present." (*People v. Huggins* (2006) 38 Cal.4th 175, 215.) "This venerable instructional rule ensures that the jury may consider all supportable crimes necessarily included within the charge itself, thus encouraging the most accurate verdict permitted by the pleadings and the evidence." (*People v. Birks* (1998) 19 Cal.4th 108, 112.)

Involuntary manslaughter is a lesser included offense of murder. (*People v. Thomas* (2012) 53 Cal.4th 771, 813; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1145; *People v. Prettyman* (1996) 14 Cal.4th 248, 274.) Whereas murder is "the unlawful killing of a human being … with malice aforethought" (§ 187, subd. (a)), involuntary manslaughter is the unlawful killing of a human being *without malice* (1) "in the commission of an unlawful act, not amounting to felony" (§ 192, subd. (b)); (2) "in the commission of a lawful act which might produce death, in an unlawful manner, or

17.

without due caution or circumspection" (*ibid.*); or (3) "in the commission of a noninherently dangerous felony … if 'committed without due caution and circumspection'" (*Bryant*, *supra*, 56 Cal.4th at p. 966, quoting *People v. Burroughs*, *supra*, 35 Cal.3d at p. 835).

"If the evidence presents a material issue of whether a killing was committed without malice, and if there is substantial evidence the defendant committed involuntary manslaughter, failing to instruct on involuntary manslaughter would violate the defendant's constitutional right to have the jury determine every material issue." (*Cook*, *supra*, 39 Cal.4th at p. 596; see *People v. Rogers* (2006) 39 Cal.4th 826, 884 ["An instruction on involuntary manslaughter is required whenever there is substantial evidence indicating the defendant did not actually form the intent to kill."].) As to what constitutes "substantial evidence" in this context, the Supreme Court explained:

> "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is "'evidence from which a jury composed of reasonable [persons] could … conclude[]'" that the lesser offense, but not the greater, was committed. [Citations.] [¶] In deciding whether there is substantial evidence of a lesser offense, courts should not evaluate the credibility of witnesses, a task for the jury. [Citations.]" (*People v. Breverman* (1998) 19 Cal.4th 142, 162; see *People v. Wilson* (1992) 3 Cal.4th 926, 942 ["Speculation is an insufficient basis upon which to require the trial court to give an instruction on a lesser included offense."].)

We conclude that there was no substantial evidence that the killing was committed without malice aforethought. "'[M]alice aforethought'" is "an essential element of the crime of murder whether it be of the first degree or of the second degree." (*People v. Bender* (1945) 27 Cal.2d 164, 180, italics omitted.) To establish the "mental state of malice aforethought," the evidence must establish that "the killing resulted from the intentional doing of an act with express or implied malice …." (§ 188.) Express malice

is established "when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature." (*Ibid.*) "Malice is implied … when a killing results from an intentional act, the natural consequences of which are dangerous to human life, and the act is deliberately performed with knowledge of the danger to, and with conscious disregard for, human life." (*Cook*, *supra*, 39 Cal.4th at p. 596; see *People v. Swain* (1996) 12 Cal.4th 593, 602-603.) Malice may be proven by direct evidence, such as a defendant's declaration of his or her state of mind before, during, or after the killing, or, in the absence of direct evidence, circumstantial evidence derived from, inter alia, a defendant's words and actions. (See *People v. Lashley* (1991) 1 Cal.App.4th 938, 945-946.)

Prior to the shooting, Amezcua, who was identified as the gunman by several witnesses, procured a loaded firearm and gloves. He and Eucario, deemed by Dilbeck to be a Sureño and VCG Sureño, respectively, expressly warned Lucero to "kick back" because they were "'going to go down and handle some business'" at 1224 Davis Street, where people were attending a party in red clothing and appeared to be Norteños. Before Amezcua and Eucario headed to the house, they and their companions circled the block twice in their vehicle. Outside of the residence, Amezcua and Eucario's group yelled Sureño gang slogans and taunts and refused to leave when asked to do so by Garcia and several of her guests. Once fighting ensued between Amezcua and Eucario's group and some of the unarmed guests, Amezcua drew and pointed the firearm at, inter alios, Isaac and Roger, who backed away. However, when Raqueno resisted, Amezcua shot Raqueno in the neck before he and Eucario left in their vehicle. Sometime after the shooting, Amezcua told Major, "I was trying to shoot more people but the gun broke." In view of this evidence of malice aforethought (see *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 108 ["only … unlawful killings committed *without malice* are defined as manslaughter"]), the trial court was not obliged to instruct the jury on any theory of involuntary manslaughter as a lesser included offense of murder (see *People v. Holloway*

19.

(2004) 33 Cal.4th 96, 141 ["no fundamental unfairness or loss of verdict reliability results from the lack of instructions on a lesser included offense that is unsupported by any evidence upon which a reasonable jury could rely"]).[22]

## II. The trial court's issuance of CALCRIM No. 250 for counts 1 and 2 and CALCRIM No. 251 for count 2 did not prejudice Amezcua because the evidence showed beyond a reasonable doubt that the erroneous instructions made no difference in reaching the verdict obtained

a. *Background*

On March 7, 2012, the prosecutor described the mental state of malice aforethought in summation:

> "Unlawful homicide is murder.… Now, murder with malice aforethought: A person is killed by another; the killing is unlawful; there's no justification …. And it's done with the state of mind that the law calls 'malice aforethought' .… [¶] … There's two kinds; it's either express or it's implied .… Express malice basically means an intent to kill. An express malice means you intend to kill.… [¶] If it's done knowing that it was dangerous and with conscious disregard for human life, that is implied malice…. [¶] … [¶] First-degree murder requires express malice …. Second-degree, express or implied malice …. It's implied malice when you do an act which shows a conscious disregard for human life, and that's second-degree.…"

Likewise, Amezcua's attorney referred to malice aforethought in summation:

> "Now, I will move on to first or second-degree murder.… [¶] … [¶] [T]he first [element] would be [Amezcua] committed an act that caused the death of another person…. [¶] The second element is when [Amezcua] acted he had the state of mind called malice aforethought…. Malice aforethought is defined in [CALCRIM No. 520.] There [are] two definitions[:] [first,] he intentionally committed an act. [¶] … [¶] The

---

**22** Since we conclude that there was no substantial evidence that the killing was committed without malice aforethought, we need not address Amezcua's assertion that a "'catch-all'" instruction on involuntary manslaughter is required where an unlawful killing does not meet the definition of murder or voluntary manslaughter.

Furthermore, because we find no error, we need not address Amezcua's argument concerning prejudicial error.

second definition of malice aforethought is that it was a natural and probable consequence[] of the act that w[as] dangerous to human life….”

After closing arguments, the trial court provided the jury with the following instructions:

“The People must prove not only that [Amezcua] did the acts charged, but also that he acted with a particular intent and/or mental state.… [¶] … [¶]

“[CALCRIM No. 250:] The crimes or other allegations charged in this case require proof of union or joint operation of act and wrongful intent. For you to find a person guilty of the crime of murder as charged in Count 1 or the crime of unlawful participation in a criminal street gang as charged in Count 2 or to find the allegation of personally and intentionally discharging a firearm or the allegation of a principal personally using a firearm, that person must not only commit the prohibited act but must do so with wrongful intent. [¶] A person acts with wrongful intent when he or she intentionally does a prohibited act. However, it is not required that he or she intend to break the law. The act required is explained in the instruction for that crime or allegation.

“[CALCRIM No. 251:] The crime of unlawful and active participation in a criminal street gang as charged in Count 2 in this case requires a proof of the union or joint operation of act and a certain mental state. For you to find a person guilty of the crime of unlawful and active participation in a criminal street gang in Count 2, that person must not only intentionally commit the prohibited act but must do so with a specific mental state. The act and the specific mental state required are explained in the instruction for that crime. [¶] … [¶]

“[CALCRIM No. 520:] [Amezcua] is charged in Count 1 with murder, in violation of Penal Code Section 187. To prove that [Amezcua] is guilty of this crime, the People must prove that, one, [Amezcua] committed an act that caused the death of another person. Two, when [Amezcua] acted he had a state of mind called malice aforethought. And three, he killed without lawful justification. There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish a state of mind required for murder. [Amezcua] acted with express malice if he unlawfully intended to kill. [¶] [Amezcua] acted with implied malice if, one, … he intentionally committed an act. Two, the natural and probable consequences of the act were dangerous to human life. And three, at the time he acted he knew his act was dangerous to human

21.

life. And four, he deliberately acted with conscious disregard for human life. Malice aforethought does not require hatred or ill will toward the victim. It is a mental state that must be formed before the act that causes death is committed. It does not require deliberation or the passage of any particular period of time. [¶] … [¶]

"[CALCRIM No. 1400:] [Amezcua] is charged in Count 2 with participating in a criminal street gang in violation of Penal Code Section 186.22, Sub[division] (a). To prove that [Amezcua] is guilty of this crime, the People must prove that, one, [Amezcua] actively participated in a criminal street gang; two, when [Amezcua] participated in a gang, he knew that members of the gang engaged in or had engaged in a pattern of criminal street gang activity; and three, [Amezcua] willfully assisted, furthered or promoted felonious criminal conduct by members of the gang, either by A, directly and actively committing a felony offense; or B, aiding and abetting in a felony offense."

b.      *Standard of Review*

We review de novo a trial court's instruction on intent and/or mental state. (See *People v. Alvarez* (1996) 14 Cal.4th 155, 219-220.)

c.      *Analysis*

A trial court has a sua sponte duty to instruct on all of the elements of a charged offense (*People v. Cummings* (1993) 4 Cal.4th 1233, 1311; *People v. Magee* (2003) 107 Cal.App.4th 188, 193), including the intent and/or mental state required to commit the offense and the union of that intent and/or mental state and the defendant's act (*People v. Alvarado* (2005) 125 Cal.App.4th 1179, 1185; see *People v. Garcia* (2001) 25 Cal.4th 744, 754.)

In the instant case, we find—and the Attorney General concedes—that the trial court improperly instructed the jury on the intent and/or mental state needed for each charged offense. The court issued CALCRIM No. 250 on the union of act and general intent for counts 1 and 2. "However, this instruction must not be used if the crime requires a specific mental state, *such as knowledge or malice* …. In such cases, the court must give CALCRIM No. 251 …." (Bench Notes to CALCRIM No. 250, italics added.) "'[M]alice aforethought'" is "an essential element of the crime of murder" (*People v.*

*Bender*, *supra*, 27 Cal.2d at p. 180) while "knowledge that the gang's members engage in or have engaged in a pattern of criminal gang activity" is an element of the gang participation offense (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130 (*Rodriguez*); accord, § 186.22, subd. (a)). Thus, the use of CALCRIM No. 250 was inappropriate. The court compounded its mistake by concurrently providing CALCRIM No. 251 on the union of act and specific intent and/or mental state for count 2. As noted, CALCRIM No. 250 and CALCRIM No. 251 are mutually exclusive instructions. Instead, the court should have given solely CALCRIM No. 251 for counts 1 and 2.

By constitutional mandate, "[n]o judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, … unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13; see *People v. Breverman*, *supra*, 19 Cal.4th at p. 173 ["The phrase 'misdirection of the jury,' … logically ""'includes every kind of instructional error."""].) "An instruction that omits a required definition of or misdescribes an element of an offense is harmless only if 'it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."' [Citations.]" (*People v. Mayfield* (1997) 14 Cal.4th 668, 774 (*Mayfield*); see *People v. Chavez* (2004) 118 Cal.App.4th 379, 387 (*Chavez*); *People v. Magee*, *supra*, 107 Cal.App.4th at p. 194; see generally *Chapman v. California* (1967) 386 U.S. 18, 24.) We explained this standard in an earlier case:

> "In assessing prejudice, we consider whether 'it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."' [Citations.] Further, '[t]o say that an error did not contribute to the verdict is … to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' [Citations.] The evidence must be "'of such compelling force as to show beyond a reasonable doubt" that the erroneous instruction "must have made no difference in reaching the verdict obtained."' [Citation.]" (*Chavez*, *supra*, at p. 387.)

23.

We find that the trial court's erroneous issuance of CALCRIM No. 250 for counts 1 and 2 and CALCRIM No. 251 for count 2 made no difference in reaching the verdict obtained. As to count 1, the court indicated to the jury at the outset that a particular mental state was needed for each charged offense and subsequently provided CALCRIM No. 520, which specifies that malice aforethought is a necessary element of first or second degree murder. (See *People v. Bolin* (1998) 18 Cal.4th 297, 328 ["'''The absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole.''"]; *Mayfield*, *supra*, 14 Cal.4th at p. 777 ["When considering a challenge to a jury instruction, we do not view the instruction in artificial isolation but rather in the context of the overall charge."] Moreover, the prosecutor and Amezcua's attorney apprised the jury of this requirement in their closing arguments. (See *Chavez*, *supra*, 118 Cal.App.4th at p. 388, citing *People v. Lee* (1987) 43 Cal 3d 666, 677 ["closing arguments to the jury are relevant in evaluating prejudice"].) CALCRIM No. 250 notwithstanding, we conclude beyond a reasonable doubt that the jury believed that proof of malice aforethought was needed to convict Amezcua of second degree murder.

As to count 2, the court advised the jury that a particular mental state was needed for each charged offense and subsequently provided CALCRIM No. 1400, which specifies that a defendant's knowledge that members of a criminal street gang engage in or have engaged in a pattern of criminal activity is a necessary element of gang participation. (See *People v. Bolin*, *supra*, 18 Cal.4th at p. 328; *Mayfield*, *supra*, 14 Cal.4th at p. 777.) We conclude beyond a reasonable doubt that the jury believed that such knowledge was needed to convict Amezcua of this offense.

**III.    The trial court did not abuse its discretion when it allowed the prosecutor to argue that jurors may draw a negative inference from an immunized witness's refusal to provide relevant testimony**

a.    *Background*

On February 21, 2012, the prosecutor informed the trial court that Antonio Ruiz, a prosecution witness and Eucario's brother, was arrested earlier that morning on unknown charges. On February 22, 2012, in response to Eucario's attorney's request for an offer of proof as to Antonio's testimony, the prosecutor stated that Antonio spoke with police at or around the time of Raqueno's death and provided significant information about Eucario's gang involvement. On February 23, 2012, Antonio, through his attorney, asserted the privilege against self-incrimination under the Fifth Amendment. The prosecutor, in turn, offered use immunity. On February 27, 2012, the court signed an order granting use immunity. Nonetheless, Antonio refused to answer the prosecutor's questions during an Evidence Code section 402, subdivision (b), hearing. On February 28, February 29, and March 1, 2012, in contravention of the use immunity order, Antonio maintained that he would not answer questions.

On February 29, 2012, at trial, Dilbeck opined that gang members "perceive that people who testify against them are de facto snitches." He detailed:

> "Gang members are not supposed to cooperate with law enforcement. If you're a Sureño and you get shot, and I go contact you, … you're either probably not going to give me great information, or you're going to give me just enough to get me off your back, and you're going to have a lot of 'I don't know,' stuff like that…. [T]hey're not supposed to cooperate with us. And you see it from investigation to investigation to investigation."

Dilbeck also testified, based on police reports, that Amezcua associated with Antonio, a "well-known VCG Sureño" known by the moniker "Rascal." At an Evidence Code section 402, subdivision (b), hearing, Dilbeck asserted that he relied on Antonio's statements in a July 24, 2008, police interview to form his opinion that Amezcua participated in a criminal street gang.

25.

On March 1, 2012, at trial, Dilbeck testified that he studied the transcript of Antonio's police interview. During the interview, Antonio stated that he was "jumped in" VCG by Raul Roja and Eucario, inter alios. He corroborated that VCG "started on Central [Avenue]," "had rules," did not have female members, "victimized rival Norteños," and "hadn't done a homicide." Dilbeck found Antonio's remarks revealing:

> "[W]hen VCG first started, they weren't known as a violent criminal street gang. They did mostly property crimes. It wasn't until about 2007 where they started taking more of a violent role. And so pretty much when they were on Central … we didn't pay [th]em a lot of attention because they weren't real violent. But when they moved to Cleveland they were right next to Norteño territory, and so all the violence ramped up. So then we started contacting more VCG guys because they were involved in a higher level of violence. [¶] And then when I looked at the photographs that were at Eucario['s] house[], where it has the pictures with the 187 …, that's where this kind of stuff ha[s] significance because now, [in] my opinion, VCG was involved in a homicide now. That's where it corroborated the information I had for my opinion. [¶] … [¶]
>
> "[Eucario 'jumping in' Antonio] shows active participation in the gang. And it also shows[,] you know, that [Eucario was] a member in good standing. You wouldn't jump in somebody if you weren't a member of that gang, so … it's very telling."

On March 1, 2012, the prosecutor asked the court, on the basis of *People v. Lopez* (1999) 71 Cal.App.4th 1550 (*Lopez*) and *People v. Morgain* (2009) 177 Cal.App.4th 454 (*Morgain*) to allow her to question Antonio before the jury so that the jury would become aware of his refusal to testify. Amezcua's attorney objected on the grounds that *Lopez* "is wrong" and *Morgain* "is [not] on point." On March 6, 2012, the court granted the prosecutor's request.

On March 6, 2012, Antonio reiterated that he would not answer questions. He was thereafter called to the stand and refused to answer the prosecutor's questions about whether he knew Amezcua or Eucario, whether he was familiar with VCG, and whether he was known by the gang moniker "Rascal." On cross-examination by Eucario's attorney, Antonio testified that he did not wish to testify against his brother. On redirect

26.

examination, he refused to answer any of the prosecutor's questions. Subsequently, the court instructed the jury:

> "Ladies and gentleman, the Court would strike the testimony of this witness. A witness has an obligation to testify and answer questions posed to that witness by all counsel. The witness does not have the right to answer questions from one attorney and not answer questions from the other attorney. Therefore, the witness having refused to answer further questions from [the prosecutor], the Court would strike all testimony of this witness. [¶] Ladies and gentleman, as I've explained before, when the Court strikes testimony, you are to treat [it] as though you have not heard it."

On March 7, 2012, the prosecutor stated in her summation:

> "You can make a reasonable inference from facts or testimony. You can make reasonable inferences. For example, you can infer from the fact that Antonio Ruiz refused to answer questions that he was—you [can] take a negative inference from the fact he did not want to testify in this case."

b.     *Standard of Review*

"A trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse [citation] and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice [citation]." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

c.     *Analysis*

"No evidence is admissible except relevant evidence." (Evid. Code, § 350.) "'Relevant evidence' means evidence … having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "The test of relevance is whether the evidence tends '"logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive. [Citations.]' [Citation.]" (*People v. Carter* (2005) 36 Cal.4th 1114, 1166.) "The trial court is vested with wide discretion in determining the relevance of evidence"

27.

(*People v. Babbitt* (1988) 45 Cal.3d 660, 681), but "has no discretion to admit irrelevant evidence" (*ibid.*).

Amezcua was charged with active participation in a criminal street gang, the elements of which are (1) "active participation in a criminal street gang, in the sense of participation that is more than nominal or passive"; (2) "knowledge that the gang's members engage in or have engaged in a pattern of criminal gang activity"; and (3) "willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang." (*Rodriguez*, *supra*, 55 Cal.4th at p. 1130; accord, § 186.22, subd. (a); see *Rodriguez*, *supra*, at p. 1132 ["The plain meaning of section 186.22[, subdivision ](a) requires that felonious criminal conduct be committed by at least two gang members, one of whom can include the defendant if he is a gang member."].)  The prosecutor intended to call as a witness Antonio, a VCG Sureño whose testimony would be relevant as to whether Amezcua and Eucario participated in the gang.  Antonio asserted the privilege against self-incrimination and the court thereafter signed an order granting him use immunity.  "[W]here a witness receives immunity, that witness's testimony is compelled and the witness no longer has a privilege against self-incrimination." (*Morgain*, *supra*, 177 Cal.App.4th at pp. 466-467, citing *United States v. Washington* (1977) 431 U.S. 181, 187 & *Kastigar v. United States* (1972) 406 U.S. 441, 455-458; see § 1324.)  Nonetheless, Antonio repeatedly stated his unwillingness to testify before he was called to the stand on March 6, 2012.  In front of the jury, he refused to answer the prosecutor's questions.  "[W]here a witness has no constitutional or statutory right to refuse to testify, … [j]urors are *entitled* to draw a negative inference when such a witness refuses to provide relevant testimony." (*Lopez*, *supra*, 71 Cal.App.4th at p. 1554; see Evid. Code, § 911, subds. (a)-(b) ["Except as otherwise provided by statute:  [¶]  No person has a privilege to refuse to be a witness … [¶] [or] to refuse to disclose any matter or to refuse to produce any writing, object, or other thing."].)  Hence, the court did not exercise its discretion "in an arbitrary, capricious, or patently absurd manner" (*People v.*

*Rodriguez*, *supra*, 20 Cal.4th at p. 9) when it allowed the prosecutor to tell jurors in summation that they may draw a negative inference from Antonio's refusal to answer her questions. "[I]f any error in judgment was committed, it was committed by [Antonio], not the court." (*Lopez*, *supra*, at p. 1556.)

Amezcua contends that the court should have admonished the jury to disregard Antonio's refusal to answer the prosecutor's questions because "there was no logical and non-speculative inference [from] which … Amezcua's jury could draw from Antonio[']s] obstina[cy]." We disagree. "An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action." (Evid. Code, § 600, subd. (b); accord, *People v. Davis* (2013) 57 Cal.4th 353, 360.) Here, Dilbeck testified that Sureños abhor snitches and are generally uncooperative with law enforcement. Antonio's recalcitrance on the stand validated Dilbeck's opinion. The jury could reasonably deduce that Antonio, by virtue of his silence, acted to protect Amezcua and Eucario, his fellow Sureños. (See *Lopez*, *supra*, 71 Cal.App.4th at pp. 1555-1556.) Such an inference was relevant to the question of whether Amezcua was guilty of the crime of gang participation.[23]

---

**23**     Because we find no error, we need not address Amezcua's argument concerning prejudicial error.

## **DISPOSITION**

The judgment is affirmed.

_____
Kane, J.

WE CONCUR:


_____
Levy, Acting P.J.


_____
Poochigian, J.

30.